# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. TARENCE NELSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-02396    Christopher Craft, Judge**

---

### No. W2011-02222-CCA-R3-CD  - Filed May 24, 2013

---

Defendant, Tarence Nelson, was indicted by the Shelby County Grand Jury for two counts of premeditated first degree murder.  Following a jury trial, Defendant was convicted as charged and sentenced by the trial court to two consecutive terms of life imprisonment.  In this appeal as of right, Defendant contends that: 1) the State failed to prove that Defendant did not act in self-defense; 2) the trial court erred by allowing into evidence a revolver found during the search of Defendant's residence that was not the murder weapon; 3) the prosecutor misquoted Defendant during closing argument in an inflammatory manner; and 4) the trial court erred by imposing consecutive sentences.  After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Stephen R. Leffler, Memphis, Tennessee, for the appellant, Tarence Nelson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; Karen Cook and Carla Taylor, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

*Trial*

The victim, Tonya Johnson, was 36 years old at the time of her death.  She was eight months pregnant with Defendant's child.  Kaye Ingram lived across the street from the

victim. She described the victim as a "quiet neighbor" who "kept to herself." On September 25, 2009, Ms. Ingram observed Ms. Johnson arrive home at approximately 5:00 or 5:30 p.m. Ms. Ingram testified that Ms. Johnson left her garage door open, which was unusual because "she never ever leaves her garage door up so [she] assumed that she probably had company coming." At approximately 6:00 p.m., Ms. Ingram went outside to watch her grandchildren ride their bikes on the sidewalk. She saw a black car pull into Ms. Johnson's driveway. She described the driver of the vehicle as a black male, between 5 feet 7 inches and 6 feet in height. He was wearing blue jeans and a white shirt. He entered the house through the garage. Ms. Ingram saw him leave Ms. Johnson's house at approximately 9:30 p.m.

Ms. Ingram and her husband decided to go to Ms. Johnson's house to tell her that her garage door was open. They knocked on her front door, and she did not answer. Ms. Ingram looked through the window beside the front door and saw Ms. Johnson "slumped over her ottoman." She yelled to another neighbor, Dixie Harber, to call 911.

Dixie Harber lived across the street from Ms. Johnson. She and her husband left their home at approximately 6:30 or 7:00 p.m. to eat dinner. She noticed that Ms. Johnson's garage door was open. After they returned home from dinner, she was sitting in her garage when she saw the Ingrams walk across the street and knock on Ms. Johnson's front door. She then heard Ms. Ingram yell at her to call 911.

Justin Grimsley, Ms. Ingram's son-in-law, described the vehicle in Ms. Johnson's driveway as a dark blue or black four-door late model sedan. Mr. Grimsley left Ms. Ingram's house to go to the store at approximately 9:30 p.m., and the car was still in Ms. Johnson's driveway. When he returned 15 minutes later, the car was gone. He walked to Ms. Harber's house to talk to Ms. Harber and her husband, who were sitting in their driveway. When Ms. Ingram yelled to Ms. Harber to call 911, he ran across the street to Ms. Johnson's house. He and the others entered Ms. Johnson's house through the garage door leading into the kitchen. They found Ms. Johnson lying across an ottoman in her living room. They checked for a pulse and did not find one. They rolled her onto her back, and Mr. Grimsley checked for a pulse on Ms. Johnson's neck but did not feel one. He then ran across the street to Ms. Ingram's house to get a respiration mask. He gave the mask to another neighbor on the scene, Steve Starnes, who tried to resuscitate Ms. Johnson while Mr. Grimsley did chest compressions until paramedics arrived. Mr. Grimsley testified that Ms. Johnson appeared to have one gunshot wound in the back of her head and one gunshot wound to her abdomen. He testified that he did not observe any signs of a struggle inside the victim's house.

Deputy James Hogan, of the Shelby County Sheriff's Office, responded to the crime scene. He found shell casings near the victim's body. Deputy Hogan searched the victim's house. He testified that there "didn't appear to be anyone else there or anything disturbed

even." After the paramedics arrived and left with the victim, he interviewed the neighbors and secured the crime scene.

Paramedic Vicki Jeffers testified that the victim was deceased when she arrived at the scene. She continued CPR on the victim and called for helicopter transportation in order to try and save the life of the victim's unborn child. Ms. Jeffers testified that the victim had wounds to the back of the head, the right chest, and the abdomen.

Detective Jason Valentine, of the Shelby County Sheriff's Office, testified that he executed a search warrant for the victim's house. Detective Valentine found a 9 millimeter shell casing near the chaise lounge. He testified that there were no weapons recovered from the victim's home. After the autopsy revealed that the victim had two gunshot wounds and only one projectile was recovered from the victim's body, Detective Valentine returned to the crime scene to search again. Another projectile was recovered from the leg of the chaise lounge.

Sergeant Trini Dean was the case officer in the investigation. Sergeant Dean interviewed witnesses who stated that the victim had arrived home at approximately 6:00 p.m. Witnesses gave a description of a black male who was seen entering the victim's residence "a few minutes" later. Sergeant Dean also interviewed the victim's family members and determined that Defendant matched the description of the subject. Sergeant Dean's investigation revealed that Defendant was visiting a girlfriend named Amanda in Memphis on the date of the murders.

Amanda Hill testified that she and Defendant began dating each other in 2005, and they dated until February, 2007. They remained friends after their romantic relationship ended. On September 25, 2009, Defendant drove from his home in Murfreesboro to Memphis to visit Ms. Hill. Defendant told Ms. Hill that he would leave work at 5:00 p.m., and she expected him to arrive at her house at approximately 9:00 p.m. Defendant arrived at her house at 10:00 p.m. She testified that Defendant was carrying a laptop and a cell phone, and he had an empty gun holster in the back of his waistband. They ate, watched a movie and then went to bed.

Defendant was arrested on September 26, 2009, and transported to the Rutherford County Adult Detention Center. Lieutenant Todd Sparks, of the Rutherford County Sheriff's Office, assisted in obtaining and executing a search warrant for Defendant's residence in Murfreesboro on September 27, 2009. Lieutenant Sparks found two firearms in Defendant's kitchen in the "open space on top of the cabinets." One was a Bushmaster AR-15 .223 caliber rifle, and the other was a Taurus .44 Magnum revolver.

Sergeant Chris Owens, of the Rutherford County Sheriff's Department, also assisted in executing the search warrant. Sergeant Owens found "several loose ammunition rounds" inside a clear plastic container in a storage compartment of a boat parked inside Defendant's garage. Sergeant Owens testified that the container held "several rounds of .40 caliber ammunition inside." He also found a nylon briefcase inside the storage compartment of the boat that contained "several different types of miscellaneous ammunition to include – I don't have a certain – an exact count but there were 12 gauge rounds and some 9 millimeter rounds as well." Sergeant Owens also found "a magazine for a semiautomatic rifle style weapon and a clip or a holster for a handgun."

Detective Nathan Cockman, of the Shelby County Sheriff's Department, also assisted in executing the search warrant for Defendant's home. A rented black Chevy Impala was beside the boat parked in Defendant's garage. Detective Cockman found an empty cell phone case with a "flowery" design inside the center console of the vehicle. Detective Cockman also found a rental agreement for the Impala inside the center console. Detective Coleman went to the location from which the car was rented and found Defendant's Chevy Tahoe. Detective Cockman found a 9 millimeter shell casing and a .40 caliber shell casing inside the center console of the Chevy Tahoe.

Agent Cervinia Braswell, a forensic scientist for the Firearms Identification Unit of the Tennessee Bureau of Investigation (TBI), testified that she examined the 9 millimeter shell casing recovered from the victim's home and the 9 millimeter shell casing recovered from Defendant's vehicle. Agent Braswell determined that the two shell casings had the same class characteristics, but they had insufficient individual characteristics to "make a conclusive identification" that they were fired from the same weapon.

Assistant Medical Examiner Lisa Funte performed an autopsy of the victim. Dr. Funte testified that the victim suffered two gunshot wounds, one to the head and another to the abdomen. Dr. Funte determined that the victim was between 35 and 37 weeks pregnant and that the fetus was viable at the time of the victim's death. Dr. Funte described the gunshot wound to the victim's head. The entrance wound was on the right side of the victim's head behind the ear. The bullet went through the soft tissue and muscles, down along the scalp and exited through the right side of the victim's neck. The bullet reentered the victim's chest and through soft tissue and muscle and then fragmented and made two exit wounds. Dr. Funte testified that the bullet "really didn't hit anything that would be immediately lethal[,]" damaging only subcutaneous muscle tissue. Dr. Funte found no soot or stippling around the wound entrance. She determined that the bullet was fired from greater than four feet away.

Dr. Funte testified that the gunshot wound to the victim's abdomen was a "rapidly fatal injury." The bullet entered the right side of the victim's abdomen and lodged in the

muscle tissues of the back near the shoulder. Dr. Funte concluded that the victim died from multiple gunshot wounds and the manner of death was homicide. Dr. Funte testified that the fetus died from utero-placental insufficiency due to lack of oxygen caused by the victim's death.

Eric Douglas testified that he had been friends with the victim since 2005. He identified the cell phone case found in Defendant's rental car as having belonged to the victim. Vicki Stewart, a sonographer at the victim's doctor's office, also identified the cell phone case as having belonged to the victim. Ms. Stewart testified that she had been performing weekly ultrasounds on the victim since early August. Ms. Stewart had seen the victim for an appointment in the afternoon on the day the victim was murdered. The victim told Ms. Stewart that "she was meeting the baby's father" for dinner. Ms. Stewart testified that the victim "seemed rather distressed at that time" and that she "just seemed like she was not looking forward to it."

Defendant testified and admitted that he shot the victim. However, he stated that she "was trying to shoot [him]." Defendant testified that he met the victim online approximately four years prior to trial. He lived in Memphis at that time. Defendant testified that when the victim learned that he was dating another woman, "it really wasn't a big deal." The victim contacted the other woman, and Defendant and the other woman did not talk again. Defendant and the victim continued their relationship. On another occasion, Defendant was having drinks with another woman at his house when the victim came in. The victim told the other woman to leave. Defendant testified that "[i]t wasn't a big commotion or pow wow[,]" and the other woman "politely left." The victim and Defendant continued their relationship. Defendant testified there were "several [more] incidents." On one occasion, a woman named Shayla was at Defendant's house at "3:00 or 4:00 in the morning." Defendant heard the victim "kicking and beating and screaming" at the front door for "probably an hour, two hours nonstop." The same woman stayed at Defendant's house again, and the victim "had her car boxed in, . . . and wouldn't let her leave." Defendant testified that there were "so many incidents" in which the victim "would . . . come over and harass [him] or the person [he] was with[,]" that he moved to another residence. On one occasion when Trella King was at Defendant's house, Defendant heard what he thought was a gunshot and saw the victim standing outside of his house. On another occasion, Amanda Hill was at Defendant's house. They were sitting at the kitchen table having breakfast. Defendant saw the victim drive by his house and he closed the window blinds. Defendant had an "uneasy feeling." He opened the front door, and the victim "c[ame] bashing through the front door." The victim was "picking up stuff and throwing it at [Defendant]." Defendant tried to restrain her, and he called the police. He testified that he was injured during that incident. On another occasion, a woman named Pamela Young was at his house when the victim arrived there. Defendant answered the door, and the victim "didn't say anything . . . . She just came

in punching [him], kicking [him], and she was just rapidly, consecutively punching [him]." Defendant did not hit the victim but tried to restrain her.

Defendant testified that he maintained a relationship with the victim because he "knew why she was upset." He testified, "I couldn't get mad at her for what was going on so I just kind of accepted that, you know, if you're going to deal with this woman and you're going to continue to see other women, this type of action is going to be a side effect. And I guess because we had known each other so long, I was just willing to deal with it."

Defendant worked providing technical support as a consultant for several companies in Memphis. He later accepted a job with Tractor Supply Company in Brentwood. He moved to Murfreesboro in December, 2007. Defendant testified that he only saw the victim on two occasions in 2009. In February or March, 2009, while the victim was visiting Defendant, she told him that she was pregnant. Defendant testified that his reaction was "neutral." Defendant testified that after the victim returned to Memphis, she sent a text message to him that she was not pregnant. Defendant had no other discussions with the victim about the pregnancy.

On September 25, 2009, Defendant left work early to drive to Memphis to visit the victim and others. He rented a vehicle because his vehicles were not reliable enough for the trip. Defendant testified that he was "going to see whoever [he] could see . . . going to do whatever [he] could do while [he was] in Memphis type of deal." He sent a text message to the victim while he was shopping in some of his favorite stores in Memphis. The victim responded and invited him to her house. She told Defendant that she would leave the garage door open. Defendant got stuck in traffic and became lost on his way to the victim's house, and he arrived at 6:45 p.m. He entered the house through the garage. He testified that the victim opened the door and walked back into the house without speaking to him. He sat beside her on the couch and spoke to her, but she did not respond.

When Defendant told the victim that he was not going to stay the night at her house, the victim "verbally lashe[d] out" at Defendant. Defendant and the victim were arguing when Amanda Hill called Defendant on his cell phone. The victim told Defendant that she was going to kill Defendant and Amanda Hill. The victim left the room, and Defendant heard cabinet doors slamming and the victim yelling. The victim came back into the living room and threw condoms at Defendant. She sat down again and threw her cell phone at Defendant. Defendant reached down to pick up the phone, and the victim yelled, "look at me [bitch]." When Defendant looked up at the victim, she was pointing a gun at his head. Defendant "froze." Defendant heard the victim pull the trigger, but the weapon did not fire. He heard her pull the trigger twice more, but it did not fire. After Defendant saw the victim remove the clip, put it back in the gun and manually cock the gun and point it at Defendant

again, Defendant pulled out his 9 millimeter pistol that he was carrying in a concealed holster and fired it at her. Defendant grabbed the items around him, including both firearms, and ran out of the house. Defendant testified that he did not check to see if the victim was injured. He circled the neighborhood three or four times and contemplated going back to the house, but he decided not to and "left the scene completely." Defendant drove to Amanda Hill's house and stayed the night.

Defendant testified that after the incident, while he was driving to Amanda Hill's house, he noticed the gun that the victim had pointed at him lying in the seat of his car, and he realized that it was his Sig Sauer that had been in the glove compartment of the rental car. Defendant apparently did not recognize the gun as belonging to him during the incident inside the victim's home. The following morning, after Defendant and Amanda Hill had breakfast together, Defendant returned to the victim's house to return the victim's laptop and cell phone. He saw a pickup truck parked outside and he left. Defendant testified that he later hid the victim's laptop, phone, the Sig Sauer and the 9 millimeter handgun "under a barn in Murfreesboro" because he had heard that the police wanted to talk to him. Defendant acknowledged that he had prior convictions for theft of property.

Amanda Hill, Pamela Young, Trella King, and Shayla Grant also testified on behalf of Defendant about the incidents in which the victim was involved. Ms. Hill testified about the incident in which the victim went to Defendant's house while Ms. Hill was present, and Ms. Hill heard "all this scuffling, screaming, [and] glass breaking," and the police responded. Ms. Young testified about an incident in which the victim went to Defendant's house while Ms. Young was present. Ms. Young testified that the victim "was either bamming on the door or ringing the door bell[,]" and Defendant stepped outside to talk to the victim. Ms. Young testified, "in the blink of an eye [the victim] had broke through the door and was in the bedroom and they were arguing and [the victim] struck [Defendant] with her fist." She saw the victim strike Defendant "a couple of more times." She testified that she did not see Defendant strike the victim, but she testified, "after that last strike [Defendant] picked her up and body slammed her on the kitchen floor." Ms. Young then left Defendant's house. Ms. Young testified that "three or four weeks" after that incident, the victim came to her house around 5:00 or 6:00 a.m. and rang the doorbell. Ms. Young went outside with a baseball bat, and the victim began "backing away and [saying] that she [wa]s not trying to start anything. She just wanted [Ms. Young] to know that [Defendant] was with her the day before." Ms. King testified about an incident when she was at Defendant's house, and the victim "would not let [her] leave." She testified the victim blocked her car in the garage until the police were called. Ms. Grant testified that she was spending a weekend with Defendant when the victim arrived at 3:00 or 4:00 a.m. and was knocking on the doors and windows. She heard Defendant and the victim arguing outside. Ms. Grant testified that the victim went

to Defendant's residence on two other occasions while Ms. Grant was visiting, and the victim and Defendant argued.

*Sentencing hearing*

At the sentencing hearing, Defendant's presentence report was admitted into evidence. The victim's mother, Janet Alexander, gave a victim impact statement. Ms. Alexander stated that the victim was the "head" of the family and that family members went to the victim for advice. The victim was a teacher, and she taught her brother to read. Ms. Alexander had been preparing for and was anticipating the birth of her granddaughter. Ms. Alexander stated that she forgave Defendant but that she would not forget.

## ANALYSIS

*Self-defense*

Defendant contends that the State did not disprove beyond a reasonable doubt that he acted in self-defense. The State responds that the only proof supporting Defendant's claim of self-defense was Defendant's own testimony, and the jury discredited it.

In determining sufficiency of the proof, the appellate court does not reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835. A criminal offense may be proven exclusively by the use of circumstantial evidence because the jury ultimately decides the appropriate weight to be given to the evidence and the inferences to be drawn therefrom. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*. § 39-13-202(d). Intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the

result." *Id*. § 39-11-302(a). The existence of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. *See State v. Rosa*, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999); *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).

In order for a defendant to prevail on a claim of self-defense, there must be a showing that he acted upon a well-founded apprehension of great bodily injury and that the actions he took were necessary. *State v. Wilson*, 556 S.W.2d 232, 243 (Tenn. 1977). The State bears the burden of proving that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within a jury's prerogative to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). The jury is not obligated to accept the defendant's testimony as to self-defense. *Id*.

The defendant argues that the proof relied upon by the State to show that Defendant did not act in self-defense was circumstantial, and Defendant points to evidence in the record that, he asserts, corroborates his account of the events surrounding the shooting. Specifically, Defendant asserts that testimony that the victim appeared distraught and upset at her doctor's appointment on the afternoon of the incident, witnesses' descriptions of the crime scene, and medical testimony about the trajectory of the victim's gunshot wounds all fit with Defendant's explanation of what happened. Defendant asserts that the State offered no evidence that the victim was not the aggressor and that the testimony of Defendant and several others supported the theory that the victim had a history of irrational behavior and propensity for violence.

The jury rejected Defendant's theory of self-defense, as was its prerogative. Upon review, we find that the evidence sufficiently supports Defendant's convictions for premeditated murder. The evidence established that Defendant rented a car and traveled from Murfreesboro to Memphis with a Sig Sauer in the glove compartment and a concealed 9 millimeter handgun on his waist. After Defendant left the victim's house, the victim was found shot twice in her living room. The victim and her unborn child died as a result of gunshots to the victim's head and abdomen. After he shot the victim, Defendant took the victim's laptop, phone and both weapons without checking to see if the victim was injured or calling for help. After he left the victim's house, Defendant went to another girlfriend's house where he ate dinner and spent the night. Defendant later concealed the victim's property and the weapons because he knew that police wanted to talk to him.

The record shows that the jury was properly instructed on self-defense. The evidence is sufficient to sustain Defendant's convictions for premeditated murder, and the jury was

free to reject Defendant's claim of self-defense. Defendant is not entitled to relief on this issue.

*Relevant evidence*

Defendant asserts that the trial court erred by allowing into evidence the revolver found during a search of Defendant's residence. Defense counsel objected on the grounds of relevance to the admission into evidence testimony that any firearms or ammunition other than 9 millimeter were found during a search of Defendant's residence. Defendant then specifically objected to the admission into evidence of a .48 caliber revolver as unduly prejudicial because of the size of the weapon. The following exchange was had outside the jury's presence:

THE COURT:     I understand. Well, so I think what the State is saying is it's relevant because [Defendant] had all these other guns and their ammunition and he had 9 millimeter ammunition, so its significance is that was the only type of weapon that was missing; is that what you're indicating?

[ASSISTANT DISTRICT ATTORNEY]:     Yes, yes.

THE COURT:     Indicating that he may have circumstantially may have disposed of the weapon?

[ASSISTANT DISTRICT ATTORNEY]:     Yes, sir.

THE COURT:     So that it couldn't be matched.

[ASSISTANT DISTRICT ATTORNEY]:     Yes, sir.

THE COURT:     Well, I'm looking at State versus Reid, R-E-I-D for the court reporter. 213 S.W.3d page[s] 8, 13, and 14. And that was in a case of a 404(b) hearing where they found a bunch of guns at Mr. Reid's house and they said that as far as

-10-

404(b) is concerned, it's not against the law to have a gun. And so for that reason it's not a crime or wrongful act and there's no 404(b) problem.

And the Supreme Court said, "In our view, the ownership of these weapons standing alone does not constitute a crime." The testimony that the witnesses saw the defendant in the possession of a weapon similar to those used in the crimes did not necessarily constitute evidence of a bad act. In this case, looking at 403 instead of 404(b). Looking at 403 it says that it's a rule of inclusion in that those items are admissible unless they're substantially outweighed by unfair prejudice.

I can see the relevance of the other guns and ammunition and the 9 millimeter ammunition with the absence of a gun. So under those circumstances, I'm going to allow those. But I'll be glad to give an instruction to the jury if you want me to, . . . that it's not a crime to own a gun. Or you could just argue that to the jury. Whatever you need me to do.

[DEFENSE COUNSEL]: Well your Honor, in one respect there may be an undue prejudice attached to it. There's one handgun that – like one I've never scene [sic] before in my life.

[ASSISTANT DISTRICT ATTORNEY]: I don't disagree with [defense counsel].

. . . .

[DEFENSE COUNSEL]: . . . I believe that firearm would be prejudicial, unduly prejudicial, and outweighing probative value.

THE COURT:                And how so?

[DEFENSE COUNSEL]:         Just because of the way it looks.

THE COURT:                Well, it's a large gun. It's a Taurus Raging Bull is the name of it. I've seen them advertised. It's just a large caliber weapon, but it's not – it doesn't have a banana clip or anything like that.

                          Is there – I mean, as far as prejudicial – you said unduly – you know, my question is: Is it unfairly prejudicial? I just don't – as long as there's not going to be an allegation that he's used these weapons in other crimes or is possessing them illegally, I just don't see the damage. How many other guns are there?

[ASSISTANT DISTRICT
ATTORNEY]:                The other one is this guy [sic].

THE COURT:                Okay. There are just two others?

[ASSISTANT DISTRICT
ATTORNEY]:                Yes, sir. And if [the court deputy] wants to check these?

THE COURT:                Here. Hand that back. All right. This is a –

[Lieutenant Sparks]:      AR-15 rifle.

THE COURT:                What is it, sir?

[Lieutenant Sparks]:      It's a Bushmaster AR-15 .223 caliber.

THE COURT:                Okay. .223 caliber. Well, and my view obviously – and here again I'm not an expert, but these guns do not fire 9 millimeter cartridges. It's clear to me that they don't.

-12-

[DEFENSE COUNSEL]:     And that's my point.

THE COURT:     Yes, sir. Well I mean, and for that reason that's why they're probative is that he has ammunition for a 9 millimeter but they don't use it. So, that would imply that he has a 9 millimeter which is not present which would imply that he disposed of one circumstantially so that it could not be matched with the bullets taken from the body.

So under those circumstances, I'm going to deny your motion. Whether we call it just a 404(b) motion or 403 or 401 relevance motion, I find that they're relevant and I don't find any unfair prejudice in showing those weapons.

Questions as to the admission of evidence generally lie within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999). When employing this standard, the lower court's decision should not be disturbed unless the lower court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002) (citations omitted).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Evidence is deemed relevant under Rule 401 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000). This court has stated "the trial court is entitled to draw upon common sense, general knowledge, and its understanding of human conduct and motivation in assessing whether certain evidence could reasonably affect an assessment of the probability of the fact to be inferred." *State v. Hayes*, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995).

Only after the court finds that the proffered evidence is relevant does the court then weigh the probative value of that evidence against the risk that the evidence will be unfairly

prejudicial. If the court, in its discretionary authority, finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Clearly, Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. *See Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999). "Thus, excluding relevant evidence under [this rule] is an extraordinary remedy that should be used sparingly, and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted).

In this case, the trial court determined that the weapons found at Defendant's house were probative of the question of whether Defendant possessed the weapon that killed the victim. The evidence was presented during the State's case-in-chief, and therefore, prior to Defendant's decision to testify and his testimony that he did in fact shoot the victim and that he owned the weapons involved in the shooting. Because the weapon used to kill the victim was not recovered, evidence that Defendant possessed ammunition of the same caliber that killed the victim and weapons that were not of the same caliber was relevant to a material fact. Therefore, the trial court did not abuse its discretion in admitting the handgun into evidence.

Defendant asserts that because the trial court relied upon Defendant's possession of the handgun as an aggravating factor at sentencing, making the comment that it was "the largest handgun [the court] had ever seen[,]" it was a "tacit admission" by the court that the handgun was prejudicial enough to have warranted its exclusion from evidence. The State failed to respond to this assertion in its brief. We conclude that despite the trial court's comment at sentencing, the trial court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by its prejudicial effect. The trial court offered to give an instruction to the jury regarding the legality of owning such weapons as those found in Defendant's home. Defendant has not persuaded this court that the admission of the handgun into evidence was unfairly prejudicial. Defendant is not entitled to relief on this issue.

*Prosecutorial misconduct*

Finally, Defendant contends that the prosecutor committed prosecutorial misconduct during closing argument when he misquoted Defendant. Defendant asserts that the following remarks by the prosecutor were so inflammatory and prejudicial as to warrant a new trial:

[Defendant] wanted both of [the victims] to die that day. That was his reason. He didn't want kids in this world. He didn't want Tonya Johnson. He never respected her. Ever. For years since 2004 he lied, he cheated on her, **he even admitted to calling her the B word** as she was carrying his child. **He called her the B word**. He shot her in the head and he shot her in the abdomen and he left her for dead. That was not respect. He didn't care about the two of them.

The State responds that Defendant waived this issue by failing to raise a contemporaneous objection at trial. *See* Tenn. R. App. 36(a); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Waiver for failure to make a contemporaneous objection notwithstanding, we agree with the State's additional argument that the prosecutor's remarks during closing argument do not constitute prosecutorial misconduct.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." *State v. Stephenson*, 195 S.W.3d 574, 603 (Tenn. 2006) (citing *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. *Bane*, 57 S.W.3d at 425. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. *Id.* (citing *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper as to negatively affect the verdict:

1.   The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2.   The curative measures undertaken by the court and the prosecution.

3.   The intent of the prosecutor in making the improper statement.

-15-

4.  The cumulative effect of the improper conduct and any other errors in the record.

5.  The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Upon review, we conclude that the prosecutor's remarks did not affect the outcome of the trial to the prejudice of Defendant. Although it appears from the record that the prosecutor's statement that Defendant called the victim a "B word" is incorrect, in light of the facts and circumstances of the case, the remark was not so inflammatory that it affected the verdict. The State's evidence against Defendant was strong; the trial court instructed the jury that arguments of counsel are to be discarded if not supported by the evidence; because Defendant failed to object, there was no curative instruction given by the trial court; because there are no other errors in the record, there is no cumulative effect; and the statement by the prosecutor does not appear to have been calculated. Defendant testified that while pointing a gun at him, the victim said, "look at me, b-word." There was also testimony that the victim called another of Defendant's girlfriends a "b-word." Therefore, although the prosecutor misstated the evidence, we find the misstatement inconsequential to the outcome of the case. Therefore, Defendant is not entitled to relief on this issue.

*Consecutive sentencing*

Defendant asserts that the trial court erred by imposing consecutive sentences based on the trial court's finding that Defendant was a dangerous offender. We review a trial court's decision to impose consecutive sentences for an abuse of discretion. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). It is the Defendant's burden to establish that his sentence is improper. *See State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court may order consecutive sentences on any one or more of several statutory bases. *See* Tenn. Code Ann. § 40-35-115(b) (2006). One of those bases is that a preponderance of the evidence establishes that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." *Id*. § 40-35-115(b)(4). When imposing consecutive sentences on this basis, the trial court also must find that consecutive sentencing is "reasonably related to the severity of the offenses" and is necessary to protect society from further aggravated criminal conduct by the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (citing *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995)).

We note that in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), the Tennessee Supreme Court held that felony sentences imposed pursuant to the 2005 amendments to the 1989 Sentencing Act must be reviewed "under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id*. at 708. However, the sentences being reviewed in *Bise* were ordered to be served concurrently. *Id*. at 687 n. 5. The supreme court has not yet addressed directly what impact, if any, its decision in *Bise* has on our review of consecutive sentences. In *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), in which the supreme court expressly extended the *Bise* standard of review to questions related to probation or any other alternative sentences, the court also cited with approval the case of *State v. Henry Floyd Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App., Oct. 9, 2012), *perm. app. granted* (Tenn., Feb. 15, 2013), which cited the *Bise* standard in reviewing consecutive sentencing. *Caudle*, 388 S.W.3d at 278. The supreme court also recently granted the State's Rule 11 application for permission to appeal a case in which a panel of this court reversed the trial court's imposition of consecutive sentencing and remanded the case to the trial court for a finding of the *Wilkerson* factors. *State v. James Allen Pollard*, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253 (Tenn. Crim. App., Sept. 17, 2012), *perm. app. granted* (Tenn. Feb. 13, 2013). As this court noted in *State v. Jereco Tynes*, No.W2010-02511-CCA-R3-CD, 2013 WL 1043202 (Tenn. Crim. App. March 13, 2013), if the *Bise* standard does apply to the review of consecutive sentences, we are led to question the continuing vitality of *Wilkerson* and *Lane* regarding their requirement for additional findings by the trial court if the trial court orders consecutive sentences on the basis of the defendant being a dangerous offender.

Nevertheless, until otherwise directed by the supreme court, we will review a trial court's order of consecutive sentencing on the basis that a defendant is a dangerous offender under the standards established in *Wilkerson*. In this case, at the conclusion of the sentencing hearing, the trial court found that Defendant had an extensive criminal history. The court stated, however, "under the circumstances and looking at the thefts, I really cannot find that his sentences on that factor alone should run consecutively." The court then considered the evidence presented at trial and concluded that Defendant was a dangerous offender whose behavior indicates no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Specifically, the trial court noted that Defendant showed no remorse and no concern for the victim or her unborn child. The trial court also found that confinement for an extended period of time was necessary to protect society from Defendant's criminal conduct and that "the aggregate length of the sentence as it reasonably relates to the offense of which the defendant stands convicted, which is basically he's not only robbed this family of their daughter but also their grandchild." The court noted, "I don't find this is a case where [Defendant] killed the mom and the baby died as a result. It think this is a case where he killed that baby." The trial court ordered that Defendant's life sentences should be run consecutively.

The Defendant contends that the trial court erred by ordering consecutive sentencing because there were insufficient reasons for finding that Defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. We disagree. As the trial court explained at the sentencing hearing, the evidence at trial showed that Defendant shot his pregnant girlfriend in the head and the stomach, claimed self-defense, and left her to die without calling for help. Defendant drove from Murfreesboro to Memphis in a rented car. He took two handguns with him. After he shot the victim, he left her house with both handguns as well as the victim's laptop and cell phone. He later disposed of the handguns and the victim's property. Defendant exhibited calmness after the shooting and showed no remorse for his actions. After he left the victim's home, he drove to the home of Amanda Hill and did not speak about the shooting. Defendant's actions were cold and calculated.

The trial court properly considered the *Wilkerson* factors, and we conclude that the trial court did not abuse its discretion in ordering Defendant's sentences be served consecutively. Defendant is not entitled to relief on this issue.

## CONCLUSION

Finding no error, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE